**REESE LLP**
Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile:  (212) 253-4272

**REESE LLP**
George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0700
Facsimile:  (212) 253-4272

**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan (to be admitted *pro hac vice*)
505 Northern Boulevard, Suite 311
Great Neck, New York 11021-5101
Telephone:  (516) 303-0552
Facsimile: 516) 234-7800
*spencer@spencersheehan.com*

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HOWARD CLARK, *individually, and on behalf of a class of similarly situated persons*, | Case No.: 20-cv-3221 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WESTBRAE NATURAL, INC. | |
| Defendant. | |

Plaintiff Howard Clark ("Plaintiff"), by Plaintiff's undersigned attorneys, alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.      Westbrae Natural, Inc. ("Defendant") manufactures, distributes, markets, labels and sells soymilk beverages purporting to be flavored only by vanilla under their Westsoy brand ("Product" or "Products").

2.      The Products are available to consumers from retail and online stores of third-parties and are sold in sizes including cartons of 32 OZ and 64 OZ.

3.      The relevant front label representations include the term "Vanilla".



4.      Unfortunately for consumers, this claim is unlawful and misleading, as the vanilla flavoring comes from, at least in part, non-vanilla plant sources.

5.      Defendant's labeling violates Food and Drug Administration ("FDA") regulations and is therefore unlawful under California Unlawful Competition Law ("UCL").

6.     Additionally, the unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains non-vanilla flavors which imitate and extend vanilla but are not derived from the vanilla bean, yet these flavors are not disclosed to consumers as required and expected.  This provides for separate violation of the consumer protection laws at issue here.

7.     Plaintiff brings this action to enjoin Defendant's conduct and also to recover monies spent by consumers for the unlawfully and deceptively labeled products.

## I.     Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

8.     Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

9.     Some of the most popular milk alternatives are made from soybeans, rice and almonds.

10.     Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[1]

11.     Studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts, 1.5 million are allergic to soy and a very small number are allergic to rice.[2]

12.     Whether due to few people being allergic to soy and tree nuts (almonds) or the different qualities of each product type, consumers seldom substitute between these products.

13.     They are typically sold in sweetened and unsweetened varieties with added characterizing flavors.

14.     The amount and type of flavoring used in rice, almond and soy milks vary based upon the texture and taste of the product type.

---

[1] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.
[2] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.

## II.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

15.    The tropical orchid of the genus Vanilla (V. planifolia) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans." [3]

16.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[4]

17.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[5]

18.    It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[6]

19.    This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

20.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[7]

---

[3] 21 C.F.R. §169.3(c).
[4] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[5] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.
[6] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.
[7] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

21.     Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.     **Food Fraud as Applied to Vanilla**

22.     Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[8]

23.     The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[9]

| Type of Food Fraud | Application to Vanilla |
|---|---|
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[10] |
| | • Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |

---

[8] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[9] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[10] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[11]<br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[12]<br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County |

---

[11] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[12] Berenstein, 423.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  - o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics
  - o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

➤ Ingredient List Deception[13]
  - o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food
  - o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor
  - o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

24.    The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

*The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[14]

---

[13] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.
[14] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

**B.   The Use of Vanillin to Simulate Vanilla**

25.    The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

26.    First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

27.    According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[15]

28.    Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

29.    Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. See Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

30.    Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

31.    This means that if a product is represented as being characterized by vanilla yet contains non-vanilla vanillin, the label and packaging must declare vanillin an artificial flavor. See Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'."); see also 21 C.F.R. § 169.181(b), § 169.182(b) (Vanilla-vanillin flavoring and Vanilla-vanillin powder).

32.    This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

---

[15] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

**C.  Production of "Natural Vanillins" Combined with "Natural Vanilla"**

33.     The past ten years have seen many vanillins purporting to be a "natural flavor" – derived from a natural source material which undergoes a natural production process.

34.     However, "natural vanillin" is not a "natural vanilla flavor" because the raw material is not vanilla beans but ferulic acid and eugenol.

35.     Ferulic acid can be converted to vanillin through a natural fermentation process which is cost prohibitive for almost all applications.

36.     Vanillin from eugenol is easier to produce in a way claimed to be a "natural process."

37.     However, because this process occurs without transparency or verification in China, regulators and consumers are not told the production method is more properly described as that of an artificial flavor, involving a chain of chemical reactions.

**III.          Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages**

38.     The "flavor industry" refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

39.     The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[16]

40.     Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained only vanilla.

41.     These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

**A.  Flavor Industry's Attempt to Disrupt Supply of Vanilla to Create a "Permanent Shortage"**

---

[16] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

42.    The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices.

43.    Contrary to their intention, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla and harvest palm oil under the pretense of "crop diversification."

44.    There have also been allegations that these programs use child and/or slave labor.

45.    Other tactics alleged to be utilized by these companies include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to remaining bidders.[17]

46.    The reasons for these counterintuitive actions is because they benefit from high vanilla prices and the use of less real vanilla.

47.    When less vanilla is available, companies must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

**B.  Use of Vanilla WONF Ingredients to Replace and Provide Less Vanilla**

48.    Though flavor companies will not admit their desire to move off real vanilla, this conclusion is consistent with the comments of industry executives.

49.    According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

50.    The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

51.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller

---

[17] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

1   quantity of vanilla beans. The result is a greater consistency in pricing, availability and

2   quality."[18]

3          52.    These compounded flavors exist in a "black box" with "as many as 100 or more

4   flavor ingredients," including potentiators and enhancers, like maltol and piperonal, blended

5   together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[19]

6          53.    The effort to replace vanilla with so-called Vanilla WONF started in the late

7   1960s, but the last 10 years have seen the proliferation of this ingredient.

8   **C.   Decline of Industry Self-Governance**

9          54.    That high level executives in the flavor industry are willing to boast of their

10  stratagems to give consumers less vanilla for the same or greater price is not unexpected.

11         55.    The once powerful and respected trade group, The Flavor and Extract

12  Manufacturers Association ("FEMA"), abandoned its "self-policing" of misleading vanilla

    labeling claims and disbanding its Vanilla Committee.

13         56.    FEMA previously opposed industry efforts to deceive consumers, but cast the

14  public to the curb in pursuit of membership dues from its largest members.

15  **IV.    Front Label is Misleading Due to Not Disclosing Non-Vanilla Flavors That**

16  **Affect the Amount of Vanilla Used and Enhance the Vanilla Taste**

17         57.    The Product's designation of its characterizing flavor as "Vanilla" without any

18  qualifying terms – flavored, with other natural flavors, artificially flavored – gives consumers the

19  impression that its entire flavor (taste sensation and ingredient imparting same) is contributed by

20  the characterizing food ingredient of vanilla beans. See 21 C.F.R. § 101.22(i)(1) (describing a

21  food which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-

22  (iii)).

23

24

25

---

26  [18] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.

27  [19] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley,

28  1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

58.    Consumers have these expectations because regulations have long been in place to require companies to designate a product's characterizing flavor in a way which tells them accurate information to make an informed choice.

59.    For instance, a food labeled "strawberry shortcake," "vanilla soymilk" or "apple pie," will be expected to contain an amount of the characterizing ingredients – strawberries, vanilla or apples – to independently characterize the food. See 21 C.F.R. § 101.22(i)(1) ("If the food contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla", in letters not less than one-half the height of the letters used in the name of the food, except that…").

60.    By not including any qualifying terms after "vanilla" such as "flavored" or "other natural flavors," consumers will expect the Product contains actual vanilla from the vanilla bean, that vanilla is the characterizing flavor, the amount of vanilla is sufficient to flavor the Product, no other flavors simulate, resemble, reinforce, enhance or extend the flavoring from vanilla.

61.    The Product's front label misleads consumers because even though it states "Vanilla," it does not disclose that it contains "Other Natural Flavors," as indicated on its ingredient list.

**INGREDIENTS**: ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS.

**INGREDIENTS**: ORGANIC SOYMILK (FILTERED WATER, WHOLE ORGANIC SOYBEANS), NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS.

A.    **Defendant's Front Label Misleads Consumers by Not Disclosing Non-Vanilla Plant Vanilla Flavors**

62.    Federal regulations define "Other Natural Flavors" as flavors not from the product whose flavor is simulated:

12

> If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

63.     The term "With Other Natural Flavors" following the name of the characterizing flavor of vanilla ("Natural Vanilla Flavor") on the ingredient list means these flavors (1) are not derived from vanilla and (2) "simulate[s], resemble[s] or reinforce[s] the characterizing flavor" of vanilla.  See 21 C.F.R. § 101.22(i)(1)(iii).

64.     Though defendant discloses the non-vanilla flavors on the ingredient list, it is also required to include them on the front label.

65.     If the amount of vanilla from vanilla beans is sufficient to independently characterize the Product, the front label could state "[Vanilla] With Other Natural Flavor." See 21 C.F.R. § 101.22(i)(1)(iii); see also 21 C.F.R. § 101.22(i)(1) ("introductory text" describing scenario where food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

66.     If the amount of vanilla from vanilla beans is insufficient to independently characterize the Product, the front label would state "[Vanilla] Flavored With Other Natural Flavor." See 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section"; see also 21 C.F.R. § 101.22(i)(1)(i).

67.     Defendant's front label fails to choose either of these options which is misleading to consumers who expect the Product's flavor to come entirely from vanilla, since there are no qualifications on the front label.

**B.** **Even If the Front Label Indicated "With Other Natural Flavor," it Would be Misleading to Fail to Distinguish "Vanilla"**

68.    If the front label merely stated "Vanilla Flavor With Other Natural Flavor," consumers would still be deceived because they are accustomed to the standardized vanilla ingredients – vanilla extract and vanilla flavoring.

69.    Because these ingredients "are expensive" and valued by consumers because of their quality, it misleading to not distinguish such flavor combinations from other similar products. Exhibit A, Letter from FDA to Ernie Molina, Warner-Jenkinson Company of California, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" when a product contains vanilla with other natural flavors so consumers are not misled as to the amount of vanilla).

70.    21 C.F.R. § 102.5(b) requires disclosure of the "percentage(s) of any characterizing ingredient(s) or component(s) [as part of the product name] when the proportion of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present in an amount greater than is actually the case."

71.    If the "Natural Vanilla Flavor With Other Natural Flavors" consists of half vanilla and half non-vanilla natural flavors, the Product name should state "contains 50% vanilla extract and 50% non-vanilla flavors" or whatever the proportions are. Exhibit A; 21 C.F.R. § 102.5(b).

**V.** **Gas-Chromatography-Mass Spectrometry Analysis Reveals the Product Contains Little if any Real Vanilla yet High Levels of Non-Vanilla Vanillin**

72.    One of the most valuable ways to detect food fraud is to break a food down into its component parts.

73.    Where a flavor is the target of food fraud, gas chromatography-mass spectrometry ("GC-MS") is "the analysis method of choice for smaller and volatile molecules such as benzenes, alcohols and aromatics" as it is able to "separate complex mixtures [, and] to quantify analytes."[20]

---

[20] ThermoFisher Scientific, Gas Chromatography Mass Spectrometry (GC/MS) Information.

14

74. Beginning with the gas chromatograph, the sample is vaporized (the gas phase) and separated into its components by a capillary column "packed with a stationary (solid) phase."

75. The compounds are "propelled by an inert carrier gas such as argon, helium or nitrogen" where they  separate from each other and "elute from the column at different times, which is generally referred to as their retention times."

76. After the components exit the GC column, "they are ionized by the mass spectrometer using electron or chemical ionization sources."

77. Ionized molecules get accelerated through the mass analyzer, which is typically a quadrupole or ion trap.

78. Then the "ions are separated based on their different mass-to-charge (m/z) ratios."

79. The last steps "involve ion detection and analysis, with compound peaks appearing as a function of their m/z ratios, with peak heights "proportional to the quantity of the corresponding compound."

80. A complex sample will generate "several different peaks, and the final readout will be a mass spectrum" which plots the elution time on the X-axis and the amount or intensity of the compounds on the Y-axis.

81. Computer databases of mass spectra are used, like a DNA database, to match the detected compounds based on their m/z ratio.[21]

82. For a flavor like vanilla, GC-MS can detect the presence of the four vanilla marker compounds, which are present in consistent amounts:

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

83. The Product was subjected to GC-MS analysis which generated the below chromatogram and peak assignment table.  Exhibit B, GC-MS Report, January 31, 2020, p. 6.

[21] *Id.*

1

**Chromatogram**

2



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20      84.    The peak assignment table identified the flavor compounds by matching their m/z

21  ratio with a computer database of virtually all known compounds. Exhibit B, GC-MS Report,

22  January 31, 2020, p. 5.

23

24

25

26

27

28

16

**Peak Assignment Table**

Table 1

Sheehan & Associates, P.C., Project #7608
Westsoy Organic Unsweetened Vanilla Soymilk
Production Code: 10219254714:44 1229629
Methylene Chloride Extract of with 1 ppm Matrix-Spiked Int. Std. by P&T-TD-GC-MS

Data File = TSQA3762

| MS Scan # | Area Integration | Peak Assignment | Conc. PPM w/w |
|---|---|---|---|
| 132 | 1837527 | diacetyl | 1.18 |
| 186 | 110971 | acetol | 0.07 |
| 238 | 212546 | acetoin | 0.14 |
| 284 | 455852 | 1,2-propylene glycol (PG) | 0.29 |
| 339 | 17449 | hexanal | 0.01 |
| 381 | 27961 | methyl pyrazine | 0.02 |
| 428 | 20701 | hexyl alcohol | 0.01 |
| 490 | 98469 | gamma-butyrolactone | 0.06 |
| 553 | 355555 | hexanoic acid | 0.23 |
| 559 | 124675 | benzaldehyde | 0.08 |
| 576 | 25500 | 2-pentylfuran | 0.02 |
| 623 | 415090 | cyclotene | 0.27 |
| 639 | 362492 | N-methylpyrrolidinone (NMP) | 0.23 |
| 655 | 52342 | gamma-hexalactone | 0.03 |
| 661 | 123598 | heptanoic acid | 0.08 |
| 676 | 91395 | 2-acetylpyrrole | 0.06 |
| 693 | 93935 | guiaicol | 0.06 |
| 700 | 62741 | nonanal | 0.04 |
| 705 | 296423 | 3-hydroxy-4,5(R)-dimethyl-2(5H)-furanone | 0.19 |
| 743 | 45519020 | maltol | 29.23 |
| 761 | 482597 | octanoic acid | 0.31 |
| 769 | 138399 | benzoic acid | 0.09 |
| 800 | 209270 | decanal | 0.13 |
| 815 | 1557448 | naphthalene-d8 (internal standard) | 1.00 |
| 820 | 163504 | 2,3-dihydrobenzofuran | 0.10 |
| 853 | 872541 | nonanoic acid | 0.56 |
| 890 | 451734 | cinnamic aldehyde | 0.29 |
| 941 | 81667 | decanoic acid | 0.05 |
| 955 | 699778 | gamma-nonalactone | 0.45 |
| 1018 | 60098160 | vanillin | 38.59 |
| 1110 | 280100 | lauric acid | 0.18 |
| 1187 | 765501 | triethyl citrate | 0.49 |
| 1212 | 141266 | syringealdehyde | 0.09 |
| 1269 | 83629 | myristic acid | 0.05 |
| 1459 | 84413 | palmitic acid | 0.05 |
| | | **Total** | **73.75** |

85.    The relative amounts of the detected compounds are indicated in columns two (Area Integration) and four (concentration parts per million or "Conc. PPM w/w.").

86.    The most concentrated compounds, corresponding to the highest peaks were from vanillin (MS Scan # 1018, 38.59 PPM) and maltol (MS Scan # 743, 29.23 PPM).

87.    With respect to the four vanilla marker compounds, the Product  only contains vanillin.

88.    Because vanillin has the same chemical profile whether obtained from vanilla beans or produced synthetically, the absence of p-hydroxybenzaldehyde, p-hydroxybenzoic acid and vanillic acid is significant.

89.    This is because most vanillin used in food to simulate vanilla is not obtained from vanilla beans but from artificial processes which convert natural source materials to vanillin.

90.    To evaluate whether the vanillin is from vanilla beans or ferulic acid, eugenol or lignin, the relative amounts of the four marker compounds are looked at to demonstrate authenticity of the vanilla.

91.    For instance, the ratio of vanillin to p-hydroxybenzaldehyde is roughly fifteen-to-one (15:1) in a sample of authentic vanilla derived from vanilla beans.

92.    Where a product or sample contains relative amounts of these compounds – or none at all – which deviate significantly from this ratio, it is a molecular indicator that what tastes like vanilla to plaintiff and consumers is actually not from vanilla.

93.    Given the total absence of the non-vanillin marker compounds and the high level of vanillin, the logical conclusion is that if real vanilla is used, it is in trace or de minimis amounts not detectable by advanced scientific means.

94.    Non-vanilla vanillin is typically added to flavors containing a drop of real vanilla to "fortify" or "spike" a vanilla taste.

95.    However, the Product's front label does not state "contains some vanilla" or "made with a drop of vanilla," but rather, designates the characterizing flavor as "Vanilla" without any qualifying terms.

96.    The Product's front label fails to declare the presence of "other natural flavor" is based in part on the detection of maltol (MS Scan # 743, 29.23 PPM).

97.    Maltol is a flavor enhancer and synthetic flavoring substance which does not "contribute a flavor of its own" but is used to enhance and substitute for real vanilla, by increasing the sweetness of a food or beverage.[22]

---

[22] 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants."); Maltol, UL Prospector, Bryan W. Nash & Sons Ltd.1.   Linalool's concentration at 0.72 PPM exceeds more than half of the compounds detected by the GC-MS analysis, revealing its importance to the overall composition of the Product.

98.     Given the importance of maltol to creating a vanilla flavor in the Product considering it appears to have little to no vanilla, and that maltol is designated a synthetic flavoring substance, no reasonable consumer would expect such an integral component of the Product to be synthetic as maltol is.  See 21 C.F.R. § 172.515(b) ("Synthetic flavoring substances and adjuvants.").

## VI.          The Product Should Be Labeled Artificially Flavored

99.     To the extent the "Other Natural Flavors" contain vanillin from a natural source and made through a natural process, yet not derived from the vanilla plant, it is misleading to not represent the Product as "Artificially Flavored" on the front label.

100.    This is because the "standards of identity for vanilla extract (21 CFR 169.175) and vanilla flavoring (21 CFR 169.177) do not provide for the use of vanillin," such that even "natural vanillin" may not "be used to make natural vanilla flavors."  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., April 19, 2005, pp. 1-2; see 21 C.F.R. § 169.175(a)(1)-(5) (listing glycerin, propylene glycol, sugar, dextrose and corn sirup as only optional ingredients for vanilla extract).

101.    Vanillin may be added to vanilla extract but the ingredient list must say "contains vanillin, an artificial flavor (or flavoring)" and the front label is required to disclose the presence of artificial flavor.  See Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring)'.").

102.    Even if the vanillin is produced through a natural process, the front label statements and images imply the Product's flavor "is a 'natural vanilla flavor'" even though naturally produced vanillin "is not derived from vanilla beans.  Exhibit D, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

103.    Naturally produced vanillin may be designated as "'natural flavor' or 'contains natural flavor'" in the context of the general flavor regulations at 21 C.F.R. § 101.22.  Exhibit D, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

104.    However, adding any type or amount of vanillin to a vanilla extract or vanilla flavoring and implying the Product contains a "natural vanilla flavor" is misleading to consumers and in violation of law.

105.    If naturally produced vanillin were added separately to another finished food, it would be listed in the ingredients as "'vanillin' or 'natural flavor' but it should not be done in a way to imply that it is a 'natural vanilla flavor' because it is not derived from vanilla beans." Exhibit E, FDA Letter, Negash Belay to Agneta Weisz, October 10, 2008.

106.    Adding naturally produced vanillin to a real vanilla flavor like vanilla extract, coupled with statements and images of vanilla deceives consumers to think the vanilla taste is from vanilla beans.

107.    The FDA's guidance on labeling naturally derived vanillin allows for it to be labeled a "natural flavor" only outside the context of the standardized vanilla ingredients "under sections 169.180, 169.181, and 169.182 in 21 CFR."  Exhibit D, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

108.    A plain reading of the flavor regulations coupled with the complete absence of non-vanillin marker compounds would require the Product be designated as "artificially flavored." See 21 C.F.R. § 101.22(i)(1)(ii) ("If none of the natural flavor used in the food is derived from the product whose flavor is simulated, the food in which the flavor is used shall be labeled either with the flavor of the product from which the flavor is derived or as 'artificially flavored.'").

**VII.        Conclusion**

109.    The identification of "Natural Vanilla Flavor With Other Natural Flavors" on the ingredient list is not sufficient to cure the misleading front label designation of "Vanilla" because it fails to tell consumers that the Product contains a de minimis amount of vanilla and that the vanilla taste is supplied by non-vanilla vanillin (an artificial flavor when used with vanilla) and maltol.

110.    The GC-MS analysis, the flavoring regulations and defendant's clear violation of the regulations provide support for the central contention that the Product's label deceives consumers to expect it contains more vanilla than it actually does.

111.    The Product's label violates the flavor declaration requirements because it either contains "an amount of characterizing ingredient insufficient to independently characterize the food, or the food contains no such ingredient."  See 21 C.F.R. § 101.22(i)(1)(i) (instructing that "the name of the characterizing flavor may be immediately preceded by the word 'natural' and shall be immediately followed by the word 'flavored'").

112.    Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud consumers.

113.    Defendant has sold more of the Products and at higher prices per unit than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

114.    The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

115.    The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

116.    Had plaintiff and class members known the truth, they would not have bought the Products or would have paid less for it.

117.    As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $4.79 per 32 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

### Jurisdiction and Venue

118.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

119.    Under CAFA, district courts have original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity.

120.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

121.    This is a reasonable assumption because defendant's Products are sold in widely throughout and have been sold bearing the allegedly misleading claims for several years.

122.    Defendant is a citizen of New York because even though it is incorporated in Delaware, its principal place of business is in New York.

123.    Plaintiff is a citizen of California.

124.    "Minimal diversity" exists because the parties are citizens of different states.

125.    This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within California.

126.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

127.    A substantial part of events and omissions giving rise to the claims occurred in this District.

**Parties**

128.    Plaintiff is a citizen of San Francisco, California.  Plaintiff bought the Product in February, 2020 from a Whole Foods store located on Market Street in San Francisco, California.

129.    Defendant Westbrae Natural, Inc. is a Delaware corporation with a principal place of business on Long Island, New York.

130.    Plaintiff was economically harmed by Defendant's false, deceptive, and misleading branding and packaging of the Product as the value of the Product was less than that Plaintiff actually purchased and was materially less than its value as misrepresented by Defendant.

131.    Plaintiff would consider purchasing the Product again if the labeling were accurate.

**Class Allegations**

132.    The classes will consist of all purchasers of the Products in California during the applicable statutes of limitations.

133.     Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

134.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

135.     Plaintiff is an adequate representative because Plaintiff's interests do not conflict with other members.

136.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

137.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

138.     Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

139.     Plaintiff seeks class-wide injunctive relief because the practices continue.

# FIRST CLAIM

## (ON BEHALF OF THE CLASS)

### (Violation of California Business & Professions Code §§ 17200 *et seq.* –

### Unlawful Conduct Prong of the UCL)

140.    Plaintiff incorporates by reference all allegations contained in the complaint as if fully set forth herein.

141.    California Business & Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice."

142.    The acts, omissions, misrepresentations, practices, and non-disclosures of Unilever, as alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act ("FFDCA") and its implementing regulations, including, at least, the following sections:

      a.    21 U.S.C. § 343, which deems food misbranded when the label contains a statement that is "false or misleading in any particular," with "misleading" defined to "take[] into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material";

      b.    21 U.S.C. § 321(n), which states the nature of a false and misleading advertisement;

      c.    21 U.S.C. §343(g), which deems a food misbranded if it purports to be a food which is subject to a standard of identity but does not comply with such standard due to not containing the ingredients required by the standard; and

      d.    21 C.F.R. § 101.18(b), which prohibits true statements about ingredients that are misleading in light of the presence of other ingredients;

143.    Defendant's conduct is further "unlawful" because it violates the California False Advertising Law ("FAL") and the Consumer Legal Remedies Act ("CLRA"), as discussed in the claims below.

144.    Defendant's conduct also violates the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Saf. Code section 109875, *et seq.* ("Sherman Law"), including, at least, the following sections:

e.    Section 110100 (adopting all FDA regulations as state regulations);

f.    Section 110290 ("In determining whether the labeling or advertisement of a food … is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account.  The extent that the labeling or advertising fails to reveal facts concerning the food … or consequences of customary use of the food … shall also be considered.");

g.    Section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food…. An advertisement is false if it is false or misleading in any particular.");

h.    Section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food … that is falsely advertised.");

i.    Section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

j.    Section 110400 ("It is unlawful for any person to receive in commerce any food … that is falsely advertised or to deliver or proffer for delivery any such food…."); and

k.    Section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

145.    Each of the challenged statements made and actions taken by Defendant violates the FFDCA, the CLRA, the FAL, and the Sherman Law, and therefore violates the "unlawful" prong of the UCL.

146.    Defendant leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

147.    Defendant's unlawful conduct caused Plaintiff and members of the Class to suffer injury in fact and to lose money or property in that the Products are illegal, and therefore of value.  It also denied them the benefit of the bargain when they decided to purchase Defendant's

Products over other products that are less expensive, and contain virtually the same or immaterially different amounts of vanilla.  Had Plaintiff and the members of the Class been aware of Defendant's false and misleading advertising tactics, they would not have purchased the Products at all, or would have paid less than what they did for it.

148.     In accordance with California Business & Professions Code section 17203, Plaintiff  seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

149.     Plaintiff  also seeks an order for the disgorgement and restitution of all monies from the sale of the Products that were unjustly acquired through acts of unlawful, unfair and/or fraudulent competition.

**SECOND CLAIM**

**(ON BEHALF OF THE CLASS)**

**(Violation of California Business & Professions Code §§ 17200, *et seq*. –**

**Unfair and Fraudulent Conduct Prong of the UCL)**

150.     Plaintiff  incorporates by reference all of the allegations of the preceding paragraphs as if fully set forth herein.

151.     California Business & Professions Code section 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

152.     The false and misleading labeling of the Products as alleged herein, constitutes "unfair" business acts and practices because such conduct is immoral, unscrupulous, and offends public policy.  Further, the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct.

153.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "fraudulent" business acts and practices, because Defendant's conduct is false and misleading to Plaintiff and members of the Class.

154.     Defendant's labeling and marketing of the Products is likely to deceive Class Members about the flavoring source and amount of vanilla of the Products.

155.    Defendant either knew or reasonably should have known that the claims and statements on the labels of the Products were likely to deceive consumers.

156.    In accordance with California Business & Professions Code section 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

157.    Plaintiff also seeks an order for the disgorgement and restitution of all monies from the sale of the Products that were unjustly acquired through acts of unlawful, unfair and/or fraudulent competition.

**THIRD CLAIM**
**(ON BEHALF OF THE CLASS)**
**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750 *et seq.***

**Injunctive Relief Only**

158.    Plaintiff incorporates by reference all preceding paragraphs.

159.    Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

160.    Plaintiff desired to purchase products which were described by defendant and expected by reasonable consumers, given the product type and representations.

161.    Plaintiff engaged in transactions as consumers who bought the Products for personal, family, or household consumption or use. Cal. Civ. Code § 1761(d)-(e).

162.    Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

163.    Plaintiff  and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

164.    In accordance with Civ Code § 1780(a), Plaintiff seeks injunctive relief for violations of the CLRA and an injunction to enjoin the deceptive advertising and sales practices.

165.     Plaintiff does not seek damages now in this Complaint, but will amend his complaint to seek damages, once notice has been sent via Cal. Civ. Code § 1782 and if Defendant does not comply with the requirements of that notice within 30 days.

166.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA.

167.     Pursuant to California Civil Code § 1780 Plaintiff seeks an order that requires Defendant to remove and/or refrain from making representations on the Products' packaging that misrepresents the Products' composition.

168.     Plaintiff and prospective class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

169.     The representations and omissions were relied on by Plaintiff and class members, who paid more than they would have, causing damages.

**FOURTH CLAIM**
**(ON BEHALF OF THE CLASS)**
**(Violation of California Business & Professions Code §§ 17500, *et seq.* –**
**False and Misleading Advertising)**

170.     Plaintiff incorporates by reference all preceding paragraphs.

171.     Defendant falsely advertised the Products by representing the Products contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and only contained flavor from vanilla.

172.     Plaintiff and other members of the class were injured in fact and lost money or property as a result of Defendant's violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.

173.     Plaintiff seeks an order requiring Defendant to remove and/or refrain from making the representations on the Products' packaging and the return of the money paid by Plaintiff and other class members.

**FIFTH CLAIM**
**(ON BEHALF OF THE CLASS)**
**Unjust Enrichment**

174.    Plaintiff incorporates by reference all preceding paragraphs.

175.    Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment:

176.    Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

177.    Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

178.    Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the Class;

179.    Awarding monetary damages and interest for those claims that seek damages (but not the CLRA, which does not seek damages at this juncture), including treble and punitive damages, pursuant to the common law and other statutory claims;

180.    Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

181.    Other and further relief as the Court deems just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: May 12, 2020                                 Respectfully submitted,


                                                    **REESE LLP**

                                                    */s/ Michael R. Reese*
                                                    Michael R. Reese
                                                    100 W 93rd Street, 16th Floor
                                                    New York, New York 10025-7524
                                                    Telephone: (212) 643-0500
                                                    Facsimile: (212) 253-4272
                                                    *mreese@reesellp.com*


                                                    **REESE LLP**
                                                    George V. Grande (Cal State Bar No. 316050)
                                                    8484 Wilshire Boulevard, Suite 515
                                                    Los Angeles, California 90211
                                                    Telephone: (310) 393-0700
                                                    Facsimile:  (212) 253-4272
                                                    *ggranade@reesellp.com*


                                                    **SHEEHAN & ASSOCIATES, P.C.**
                                                    Spencer Sheehan
                                                    505 Northern Blvd Ste 311
                                                    Great Neck, New York 11021-5101
                                                    Tel: (516) 303-0552
                                                    Fax: (516) 234-7800
                                                    *spencer@spencersheehan.com*

                                                    *Counsel for Plaintiff and the Proposed Class*

**AFFIDAVIT OF MICHAEL R. REESE**

**PURSUANT TO CALIFORNIA CIVIL CODE § 1780**

Michael R. Reese declares:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Reese LLP, attorneys of record for Plaintiff.

2.      I am one of the attorneys principally responsible for the handling of this matter.  I am personally familiar with the facts set forth in this declaration, and if called as a witness, I could and would competently testify to the matters stated herein.

3.      This action has been commenced in a county described in California Civil Code section 1780 as a proper place for the trial of the action.  The transactions or a substantial portion thereof occurred in San Francisco County, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2020, at New York, New York

*/s/ Michael R. Reese*
_____
Michael R. Reese